**AIR TRANSPORT ASSOCIATION OF CANADA, Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRATION and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

**Societe Air France, Petitioner,**

v.

**Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

**Deutsche Lufthansa A.G. (Lufthansa German Airlines), Petitioner,**

v.

**Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

**British Airways Plc, Petitioner,**

v.

**Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

**LTU Lufttransport–Unternehmen GmbH., Petitioner,**

v.

**Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

**Qantas Airways Limited, Petitioner,**

v.

**Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.**

Air New Zealand, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

KLM Royal Dutch Airlines, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Air Transport Association of Canada, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Air New Zealand, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

British Airways Plc, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Deutsche Lufthansa A.G. (Lufthansa German Airlines), Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

KLM Royal Dutch Airlines, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

LTU Lufttransport–Unternehmen GmbH., Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Qantas Airways Limited, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Societe Air France, Petitioner,

v.

Federal Aviation Administration and Jane F. Garvey, Administrator, Federal Aviation Administration, Respondents.

Nos. 00–1334, 00–1342 to 00–1347, 00–1351, and 01–1170 to 01–1177.

United States Court of Appeals, District of Columbia Circuit.

Argued May 14, 2001.

Decided July 13, 2001.

M. Roy Goldberg for Air Transport Association of Canada argued the cause for the joint petitioners. Michael Goldman for Societe Air France, Sheila C. Cheston for Deutsche Lufthansa A.G. (Lufthansa German Airlines), Don H. Hainbach for British Airways Plc, Frederick S. Hird, Jr. for LTU Lufttransport–Unternehmen GmbH., Moffett B. Roller for Qantas Airways Limited, Frederick Robinson for Air New Zea-

land and Paul V. Mifsud for KLM Royal Dutch Airlines were on the joint brief for all the petitioners. Robert W. Kneisley entered an appearance.

Robert D. Kamenshine, Attorney, United States Department of Justice, argued the cause for the respondents. Robert S. Greenspan, Attorney, United States Department of Justice was on brief.

Before: HENDERSON, TATEL and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The petitioners, Air Transport Association of Canada, Societe Air France, Deutsche Lufthansa A.G. (Lufthansa German Airlines), British Airways Plc, LTU Lufttransport–Unternehmen GmbH., Qantas Airways Limited, Air New Zealand and KLM Royal Dutch Airlines, challenge an interim final rule issued by the Federal Aviation Administration (FAA) establishing fees for certain flights that transit through United States-controlled airspace but neither take off from, nor land in, the United States (overflights). They argue, *inter alia*, that the rule does not accord with the authorizing statute. Because the FAA has failed to explain why the fees it established satisfy the statutory requirements, we vacate the rule and remand to the FAA for further proceedings.

## I.

The Federal Aviation Reauthorization Act of 1996, Pub.L. No. 104–264, § 273, 110 Stat. 3213, 3239–40, codified at 49 U.S.C. § 45301 (Act), directs the FAA to establish a fee schedule and collection process to cover air traffic control and related services provided to overflights.[1] The Act requires that the fees imposed on over-

---

1. The Act provides in relevant part:

 (a) *Schedule of fees.*—The Administrator shall establish a schedule of new fees, and a collection process for such fees, for the following services provided by the Administration:

 (1) Air traffic control and related services provided to aircraft other than military and civilian aircraft of the United States government or of a foreign government that neither take off from, nor land in, the United States.

 (2) Services (other than air traffic control services) provided to a foreign government or services provided to any entity obtaining services outside the United States, except that the Administrator shall not impose fees in any manner for production-certification related service performed outside the United States pertaining to aeronautical products manufactured outside the United States; and

 (b) *Limitations.*—

 (1) Authorization and impact considerations.—In establishing fees under subsection (a), the Administrator—

 (A) is authorized to recover in fiscal year 1997 $100,000,000; and

 (B) shall ensure that each of the fees required by subsection (a) is directly related to the Administration's costs of providing the service rendered. Services for which costs may be recovered include the costs of air traffic control, navigation, weather services, training and emergency services which are available to facilitate safe transportation over the United States, and other services provided by the Administrator or by programs financed by the Administrator to flights that neither take off nor land in the United States.

 (2) Publication; comment.—The Administrator shall publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued.

 *49 U.S.C.A. § 45301(a), (b) (footnote omitted).*

flights be directly related to the FAA's costs of providing the service rendered to those flights. The FAA has twice attempted to establish the fees authorized by the Act.

In 1997 the FAA issued an interim final rule establishing the first fee schedule for overflights (1997 Rule). *See* Fees for Air Traffic Services for Certain Flights Through U.S.-Controlled Airspace, 62 Fed. Reg. 13,496 (Mar. 20, 1997). The 1997 Rule explained that the services provided to overflights required two types of expenditures: incremental (*i.e.*, costs that increased with the quantity of services provided) and fixed and common (*i.e.*, costs that remained unchanged regardless of the quantity of services provided—for example the cost of radar installations and computer software—and costs that could not be attributed to any particular flight or class of flights). *See Asiana Airlines v. FAA*, 134 F.3d 393, 395–96, 401 (D.C.Cir.1998) (describing 1997 Rule). The FAA decided to recoup from overflights both types of expenditures. To compute the appropriate amount of fixed and common costs that should be allocated to overflights, the FAA relied on a methodology called "Ramsey pricing," which distributed the costs among "classes of users based on the elasticity of their demand for services in an effort to minimize the effect of the regulation on the behavior of users." *Id.* at 396.

Airlines affected by the fee schedule challenged the 1997 Rule, contending that the FAA exceeded its statutory authority by computing fees, at least in part, on the value of the services to the recipient rather than on costs. We were persuaded by the argument. *See id.* at 401. We explained that "[s]tatutory language requiring that 'each' fee be 'directly related to ... costs

of providing the service rendered,' expresses a clear congressional intent that fees must be established in such a way that each flight pays according to the burden associated with servicing that flight," *id.* at 402, and "insofar as the FAA allocated fixed and common costs using the Ramsey pricing methodology, its fee structure impermissibly included a component based on value to the user." *Id.* at 401. Accordingly, we vacated the 1997 Rule and remanded to the FAA for further proceedings.

In June 2000 the FAA published another interim final rule establishing a new schedule of overflight fees (2000 Rule). *See* Fees for FAA Services for Certain Flights, 65 Fed.Reg. 36002 (June 6, 2000). Effective August 1, 2000, an overflight travelling in "enroute" airspace must pay $37.43 per 100 nautical miles (or portion thereof), while an overflight using only "oceanic" airspace must pay $20.16 per 100 nautical miles (or portion thereof).[2] The 2000 Rule itself does not explain how the FAA arrived at the enroute and oceanic rates but refers to two record documents that "detail how the fees in this rule were determined and calculated." *Id.* The first document is a report by the Arthur Anderson accounting firm entitled "Cost Methodology Used to Develop Cost of Enroute and Oceanic ATC Services" (Arthur Anderson Report). It describes (1) how the FAA's cost accounting system tracks the costs incurred by the FAA and (2) how the FAA assigned those costs to enroute and oceanic air traffic control services. The second document is a report entitled "Overflight Fee Development Report" (Overflight Report). It was prepared by the FAA itself and details the FAA's methodology used to

---

**2.** The 2000 Rule defines "enroute" airspace as "airspace where primarily radar-based air traffic services are provided." 65 Fed. Reg. at 36004. "Oceanic" airspace is in turn defined as "airspace where primarily procedural air traffic services are provided." *Id.*

calculate the fees imposed by the 2000 Rule.

The Overflight Report explains that the fee development process involved four steps: (1) determining the FAA's full costs of providing both enroute and oceanic air traffic control services to all flights—that is, overflights and non-overflights;[3] (2) determining which of the costs identified in step one met the requirement of being "directly related" to the services rendered by the FAA; (3) determining, based on the costs computed in step two, unit costs for providing enroute and oceanic air traffic control services to overflights;[4] and (4) establishing overflight fees that cover air traffic control service costs as well as billing and collection costs. To compute the "unit costs" (step three), the FAA divided the "directly related" costs identified in step two by the total number of miles flown by all aircraft using the enroute airspace and oceanic airspace, respectively. Explaining that the unit costs computed in step three were an appropriate measure of the cost of services provided to overflights, the FAA stated:

> Because the level of [air traffic control] services are [sic] assumed identical for all aircraft operations within a particular

environment (i.e., enroute or oceanic), it is reasonable to assume that the costs of providing [air traffic control] services to overflights are proportional to total ATC costs within each environment. Consequently, the unit costs of providing [air traffic control] services to overflights within each environment is [sic] identical to the unit costs of providing [air traffic control] services to all air traffic within each environment.

Revised Joint Appendix (JA) 19; *see also* JA 13 (same). Based on this methodology, the FAA concluded that unit costs for enroute overflights were $36.14 per 100 nautical miles (or portion thereof) and unit costs for oceanic overflights were $19.47 per 100 nautical miles (or portion thereof). The amounts were adjusted to include billing and collection expenses, resulting in the $37.43 and $20.16 fees set forth in the 2000 Rule.

Within 60 days of publication of the 2000 Rule, the petitioners sought review in this court. *See* 49 U.S.C. § 46110(a).[5]

## II.

■ The petitioners' first argument is that in promulgating the 2000 Rule the FAA was required (but failed) to comply

---

**3.** Non-overflights are flights that either take off from or land (or both) in the United States.

**4.** The Arthur Anderson Report explains that costs incurred in providing air traffic control services to aircraft arriving to and departing from airport facilities (known as "terminal" services) are not included in the enroute or oceanic cost pools. Also excluded from the two cost pools are costs incurred for providing services—like pilot briefings, search and rescue coordination, aviation weather information (known as "flight services")—to non-overflights.

**5.** Earlier in this case, the FAA argued the petitioners' appeals might be premature and therefore it was "a close question" whether we had jurisdiction. The FAA has since con-

ceded that no jurisdictional problem prevents our deciding the case on the merits. Respondents' Response to Joint Motion to Consolidate Petitions for Review (filed April 23, 2001). We are satisfied that the petitioners' notices of appeal were timely and that we have jurisdiction pursuant to 49 U.S.C. § 46110(a). *See id.* ("[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Federal Aviation Administration with respect to aviation safety duties and powers designated to be carried out by the Administrator) under this part may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit ....").

with the notice and comment requirements of the Administrative Procedure Act (APA).[6] Section 553 of the APA requires an agency to publish a "[g]eneral notice of proposed rule making" and to "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(b), (c); *see Asiana,* 134 F.3d at 396. The Congress may modify the requirements but a "[s]ubsequent statute may not be held to supersede or modify [the APA] . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see Asiana,*. 134 F.3d at 396. In *Asiana,* we held that section 45301(b)(2) exempted the 1997 Rule from the APA's notice and comment requirements. *See id.* at 399 ("To summarize, we hold that, to the extent that § 45301 specified otherwise, the FAA was not required to conform to APA § 553 procedures. Because the FAA complied with § 45301, the process by which it implemented fees for overflights withstands the petitioners' challenge."). The question now before us is whether section 45301(b)(2) authorizes the adoption of the 2000 Rule without notice and comment as well. We conclude that it does.

The Act authorizes the FAA to "publish in the Federal Register an initial fee schedule and associated collection process as an interim final rule, pursuant to which public comment will be sought and a final rule issued." 49 U.S.C. § 45301(b)(2).

The petitioners reason that, because the 1997 Rule already established the "initial" fee schedule authorized by the statute, the fee schedule established by the 2000 Rule was not the "initial" fee schedule and, accordingly, in promulgating it the FAA should have complied with the APA's notice and comment provisions. We disagree.

Our decision in *Asiana* vacated the 1997 fee schedule in its entirety. As we have explained before, "[t]o 'vacate' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'" *Action on Smoking & Health v. Civil Aeronautics Bd.,* 713 F.2d 795, 797 (D.C.Cir.1983) (per curiam) (citations omitted). Thus, the *Asiana* holding had the effect of restoring the status quo ante, namely that no fee schedule was in effect. *See id.* ("[B]y vacating or rescinding the recissions [sic] proposed by ER–1245, the judgment of this court had the effect of reinstating the rules previously in force . . . ."). In light of the status quo ante, the 2000 Rule plainly establishes only "an initial [rather than a subsequent] fee schedule and associated collection process." Accordingly, the FAA was entitled to establish the overflight fees using an interim rulemaking without notice and comment.[7]

---

**6.** Section 553(b) and (c) of the APA provides in relevant part:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
> (1) a statement of the time, place, and nature of public rule making proceedings;
> (2) reference to the legal authority under which the rule is proposed; and
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

. . .

> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553(b), (c).

### III.

 We review the FAA's adoption of the 2000 Rule to determine whether it is "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court explained in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc.*, 419 U.S. at 286, 95 S.Ct. 438. *See also Camp v. Pitts*, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (per curiam).

*Id.* at 43, 103 S.Ct. 2856. To survive arbitrary and capricious review, the 2000 Rule must contain a "satisfactory explanation" for the FAA's conclusion that the overflight fees imposed are "directly related" to the FAA's cost of providing service to overflights. *See* 49 U.S.C. § 45301(b)(1)(B); *Asiana*, 134 F.3d at 402. In view of the methodology followed by the FAA in establishing the fees, *see supra* pages 276, there must be at least record support for the proposition that the FAA incurs the same costs in providing service to overflights and nonoverflights using either the enroute airspace or the oceanic airspace. If that proposition is not true, the overflight fees established by the 2000 Rule would not be "directly related" to the FAA's costs of providing service to overflights as the Act requires.

The petitioners contend that the FAA erroneously concluded that costs for providing services to non-overflights are the same as the costs of providing services to overflights. Overflights are different from other flights, the petitioners argue; they fly in high altitudes and do not require air traffic control assistance to ascend or de-

---

7. Because of our decision to vacate and remand once again, *see infra* pages 15–16, on remand the FAA is again entitled to promulgate overflight fees using an interim rulemaking without notice and comment.

scend either to airports or to lower altitudes surrounding airports. "Because [the] FAA must expend a substantially greater level of effort (in manpower and other resources) to provide air traffic control services to low altitude and transitional flights than it does for overflights, the FAA's costs of providing these services to an overflight must be lower, on average, than the FAA's cost of providing these services to all aircraft within a particular environment." Revised Opening Brief of Petitioners at 27–28.

The FAA defends its decision and argues the overflight fees conform to the Act's requirements. That may be so but we are unable on this record to evaluate the merits of the FAA's arguments. The FAA failed to provide any record justification for the proposition that costs for servicing overflights are the same as costs for servicing non-overflights. It simply assumed it was so. *See* JA 19 ("Because the level of [air traffic control] services are [sic] *assumed* identical for all aircraft operations within a particular environment (i.e., enroute or oceanic), it is reasonable to *assume* that the costs of providing [air traffic control] services to overflights are proportional to total ATC costs within each environment." (emphasis added)). Even under the more deferential standard of review applicable to an interim rule, *see Competitive Telecomms. Ass'n v. FCC,* 87 F.3d 522, 531 (D.C.Cir.1996) ("The proper judicial response to an interim rule is … to review it with the understanding that the agency may reasonably limit its commitment of resources to refining a rule with a short life expectancy."), this is not enough. And, while we agree with the FAA that "'we do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority,'" Revised

Brief for Respondent at 38 (quoting *City of Los Angeles v. Department of Transp.,* 165 F.3d 972, 977 (D.C.Cir.1999)), "[w]ith its delicate balance of thorough record scrutiny and deference to agency expertise, judicial review can occur only when agencies explain their decisions with precision, for '[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action....'" *American Lung Ass'n v. EPA,* 134 F.3d 388, 392 (D.C.Cir. 1998) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

Because the FAA has failed to articulate the basis for its conclusion that "the unit costs of providing [air traffic control] services to overflights within each environment is [sic] identical to the unit costs of providing [air traffic control] services to all air traffic within each environment," we vacate the 2000 Rule and remand to the FAA for further proceedings consistent with this opinion.

*So ordered.*